**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | **CRIM. NO. RDB-10-0212** |
| GREGORY ALFRED WHYTE | : | |
| a/k/a "Tony Smith," | | |
| a/k/a "Manny," | : | |
| Defendant. | : | |

...oOo...

**GOVERNMENT'S COMBINED RESPONSE TO**
**ALL PRE-TRIAL MOTIONS FILED BY DEFENDANT**

The United States of America, by and through its undersigned attorneys, files this consolidated response to the pre-trial motions filed by the defendant in this matter. For the reasons stated below, the defendant's motions should be denied.

**INTRODUCTION**

On April 27, 2010, a federal grand jury sitting in this District returned a three-count indictment charging the defendant with various violations of the Controlled Substances Act, including conspiracy and two substantive counts for possession with intent to distribute multi-kilo quantities of cocaine for drug trafficking activity spanning from on or about March 1, 2008 and continuing thereafter until on or about June 2, 2009. Trial is scheduled to begin on September 13, 2010.

As relevant here, the defendant has filed the following three pre-trial motions:

> (1) Paper # 28: Motion for Severance of Counts
>
> (2) Paper # 29: Motion to Suppress Identification Evidence
>
> (3) Paper # 30: Motion to Suppress Evidence

For the reasons set forth below, these motions should be denied.

**FACTUAL BACKGROUND**

**1. The 16 Kilo Shipment of June 2009 (Counts One and Two)**

At the outset, it should be noted that the Court is familiar with the underlying offense conduct, and in particular with the circumstances of the shipment to Coastal Air, which is near BWI in

Hanover, MD, from EDI Express in California, of a refrigerator containing sixteen kilos of cocaine, from presiding over *U.S. v Ronald Hamilton, et al*, RDB 09-0321. All of the defendants in that case have now entered guilty pleas, though some are pending sentencing. Further investigation in that case and of a related multi-kilo cocaine shipment in March 2008 combined with the cooperation of several codefendants in the Hamilton case has resulted in the identification of WHYTE as the leader/organizer of both shipments (and of two related shipments to California of almost $380,000 in cash).

On May 29, 2009, agents for the Drug Enforcement Administration (DEA) in Los Angeles intercepted a package containing a refrigerator in which was secreted 16 kilograms of cocaine. The package was being shipped via a common carrier called EDI Shipping Express to "Michael Turner, 1621 N. Fulton Avenue, Baltimore, MD 21227, Baltimore, Maryland." See, Attachment 1, shipping label. DEA agents in Baltimore were then alerted and the package was sent to Baltimore (accompanied by a DEA agent) in order to attempt a "controlled delivery" in an effort to apprehend the individuals who were to receive the 16 kilograms of cocaine. With the cooperation of the shipping company, the package was placed with Coastal Air Freight, located near BWI Airport in Hanover, Maryland, in anticipation of the package being picked up by local drug traffickers. The box containing the cocaine was being shipped to "MICHAEL TURNER" at 1621 Fulton Avenue in Baltimore. *See* Attachment 1. It is worth noting at this point that when defendant WHYTE was arrested on May 13, 2010, he was in possession of a piece of paper on which was written "MICHAEL TURNER" at 1621 Fulton Avenue. *See*, Attachment 2, seized paper.

The box containing the 16 kilos of cocaine was received by DEA in Baltimore on May 29, 2009. On June 1, 2009, DEA agents established surveillance around Coastal Air. That day, TFO Darin Cover observed a black Mitsubishi, MD tag 3EPA79 travel through the parking lot adjacent to Coastal Air. Although the driver could not be observed closely enough to be identified, MVA records confirmed that the Mitsubishi was registered to the defendant, Gregory Whyte.

While preparing the shipment for the controlled delivery at Coastal Air, DEA agents received information that an individual had recently sent a large box sized package *from* Coastal Air *to* EDI Express, in Gardena, California, where the refrigerator containing the 16 kilos had originated. When DEA agents in California responded to EDI, they learned that an individual from Maryland named Demetrius Butler had just arrived at EDI and was attempting to pick up the package that had been shipped from Maryland.  Subsequent to an interview of Butler, who is a known associate of Whyte, DEA agents obtained a search warrant for the package. It was found to contain a Sentry model safe from which was recovered $299,570 in cash.  On November 18, 2009, an employee at Coastal Air was presented a photo array by TFO Darin Cover at which time the witness positively identified a photo of the defendant, WHYTE, as the person (in company with a taller man) who to shipped the package containing the $299,570 that was seized at EDI.

During the morning and early afternoon on June 2, 2009, DEA agents continued surveillance in and around the office of Coastal Air Freight. The agents observed Ronald Hamilton, Marvin Leach, Edward Bryant and Keenan Hughes operating two separate Honda cars in the area. Specifically, both Hondas (one silver, the other blue) drove through Coastal Air Freight's parking lot on a number of occasions, conducting counter-surveillance in an effort to detect the presence of law enforcement. Early in the afternoon, the agents observed occupants of the silver Honda, later identified as Marvin Leach and Keenan Hughes, meeting with two white males in an adjacent parking lot. The two white males, later identified as John and Ken Holtman, had driven to the location in a blue and white Ford pick-up truck.  After meeting with Leach and Hughes, the Holtmans, shortly before 2:00 pm, made their way to Coastal Air Freight's office. There, they claimed the package shipped to Michael Turner. When the Holtmans attempted to load the package into their pick-up truck, they were arrested by law enforcement and read their *Miranda* rights.

The Holtmans voluntarily stated that while purchasing heroin earlier that day, they had been approached in west Baltimore City by two black males, believed to be Whyte and an associate, who asked them if they wanted to make some money. The Holtmans were instructed to go to an area near Coastal Air Freight's office and await instructions. There, they were met by two black males (Leach

and Hughes) in a silver Honda who told them to pick up a package at the shipping office in return for a payment of cash. They were then given a bill of lading, $200 to pay for the shipping, and directions to the shipping office. The Holtmans were arrested as they loaded the box into their pickup truck.

While the arrests of the Holtmans was taking place, surveillance units in the vicinity of the shipping office observed the movements of the blue and silver Hondas. Both vehicles were followed from the area and stopped. Four other individuals - Bryant, Hughes, Leach, and Ronald Hamilton - were arrested. As will be seen at trial, at least two of these defendants have cooperated with law enforcement and identified WHYTE as the leader and organizer of the conspiracy to possess the 16 kilo shipment of cocaine.

### 2. The 13 Kilo Shipment of March 2008 (Counts One and Three)

Based on their investigation of the 16 kilo seizure in June 2009, and the identification of the black Mitsubishi registered to Whyte that was observed on the parking lot of Coastal Air on June 1, 2009, DEA agents identified WHYTE as the person who coordinated the shipment and delivery of a package containing 13 kilos of cocaine in March 2008.

On March 18, 2008, Maryland State Police Cpl. Andy Johnson intercepted a package containing 13 kilos of cocaine at the UPS facility in Baltimore. The package had been shipped from California addressed to Sally Dowell, Apt. B, 4 Ridgebury Ct., Baltimore, MD 21244-1546. Upon responding to that address, agents discovered a note on the front door of the apartment directing UPS to leave the parcel at the door. The apartment seemed to be unoccupied. It was last leased to one Michael Ward, whose photo was obtained.

At about 10:30 a.m., surveillance was set up on the apartment and in the immediate vicinity. At about 11:00 a.m., agents observed a blue Toyota Camry park in front of the apartment building. An individual from that vehicle walked to the vestibule of 4 Ridgebury Court and looked in the direction of Apt B. Surveillance agents incorrectly identified that person to be Michael Ward. That individual then returned to the Camry, which he then parked around the corner about a block away

and remained in the vehicle. At about noon, an agent dressed as a UPS employee delivered the parcel, leaving it outside the door of Apartment B. At approximately 12:15 p.m., after the staged delivery, the individual from the Camry returned to the vestibule of Apt. B. Without moving the parcel, that individual left the area in the blue Toyota Camry while using a cellphone. The Camry was followed to Security Square Mall where parked near an entrance. Surveillance agents lost sight of the driver at this point.

At about 12:42 p.m., Jarrod Ross approached the parcel outside Apartment B. He used a box cutter to remove an exterior shipping box, which he left behind. Ross was arrested as he carried the box containing the 13 kilos of cocaine away from he building.

Subsequently, the Toyota Camry at Security Square Mall was seized and searched pursuant to a warrant.[1] Among the items recovered from inside the vehicle was a handwritten note bearing the tracking number for the package containing the 13 kilos of cocaine. Also found was a receipt from a Baltimore area shipping company, "Goin Postal." The receipt was for a box cutter and a 16x16 shipping envelope. A UPS tracking detail sheet was also recovered in the Camry, identifying a parcel shipped *from* Goin Postal *to* an address in Ventura, California. The shipping date was 3/17/08. Using the information on the UPS tracking form, the package shipped from Goin Postal was located en route in Louisville, Kentucky, where it was seized and searched pursuant to a warrant. It was found to contain some $78,000 in cash. In February 2009, two employees at the Baltimore Goin Postal store made separate photo array identifications of the defendant Whyte as the person who shipped the parcel containing the $78,000 on March 17, 2008.

The blue Camry was found to have been leased by Deidre Moultrie and Tony Smith. Ms. Moultrie subsequently identified SMITH and the defendant Whyte to be the same person, known to her as Tony Smith.

---

[1] The searches of the two parcels containing the cocaine in March 2008 and June 2009, of two parcels containing cash and of the Camry in June 2009 have not challenged by Whyte, nor has the recovery of any items recovered from his person incident to his arrest on May 13, 2010.

Forensic processing of the blue Camry and its contents by Baltimore County Police led to the recovery of latent fingerprints identified as those of the defendant, whose known fingerprints prints were on record based on a criminal record that includes a prior Maryland federal conviction for which he was sentenced to 15 years and for which he remains on federal supervised release.

**Whyte's fingerprints were recovered**:

A. from the back of a TMobile calling card found in the front center console of the Camry, right ring finger (L02) ;

B. from the exterior of the driver's door, left middle finger (L03);

c. from two handwritten notes (items 80017-003) found in the car, right thumb(L12) ,

### 3. Whyte's Indictment, His Use of the Alias TONY SMITH and His Arrest On May 13, 2010

Based on the foregoing facts and testimony of certain cooperating witnesses (which will be disclosed no later than August 30, 2010) a federal grand jury in Baltimore returned a three- count indictment against WHYTE on April 27, 2010. DEA agents located and arrested him on May 13, 2010. As noted above, search of the defendant's person incident to his arrest revealed that he was carrying, among other things, a piece of paper on which was written the name and address of the person to whom the refrigerator containing the 16 kilos was being shipped via Coastal Air in June 2009. The vehicle the defendant was operating at that time, an Infiniti registered to one Dennis Abel (who was previously convicted in this district of a federal drug trafficking offense) was searched pursuant to a warrant issued by a U.S. Magistrate Judge in Baltimore. A residence associated with the investigation, 211 Somerset Bay Drive, was also searched pursuant to a warrant.

Keyshawn Davis, who has described herself as a friend of the defendant at the time of his arrest in May 2010, has likewise identified the defendant Whyte as the person she knew as Tony Smith. She has also identified the photos from the Tony Smith and Gregory Whyte MVA photo licenses to be the same person, that being the person known to her as Tony Smith.

## ARGUMENT

### I. MOTION FOR SEVERANCE OF COUNTS.

The defendant contends that certain counts in the indictment should be severed from each other. This contention is without merit and should be rejected.

A.     **All of the Counts in the Indictment Are Properly Joined Under Rule 8 of the Federal Rules of Criminal Procedure.**

Federal Rule of Criminal Procedure 8 permits joinder of separate offenses if the offenses charged are (1) of the same or similar character, (2) based on the same act or transaction, or (3) connected with or constitute parts of a common scheme or plan. *See* FED.R.CRIM.P. 8(a). The Fourth Circuit has "interpreted the latter two prongs of this rule flexibly, requiring that the joined offenses have a 'logical relationship' to one another." *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005) (quoting *United States v. Hirschfeld*, 964 F.2d 318, 323 (4th Cir. 1992)). A common scheme has been defined as a "series of acts unified by some substantial identity of facts or participants." *United States v. Porter*, 821 F.2d 968, 972 (4th Cir. 1987). Rule 8 "permits very broad joinder because of the efficiency in trying the defendant on related counts in the same trial." *Cardwell*, 433 F.3d at 385. "[C]ourts ... have a strong interest in favor of joinder of offenses; in particular, joinder of offenses reduces the waste of precious judicial and prosecutorial time in the already overburdened federal judicial system and reduces the burdens on witnesses from testifying at multiple trials." *Id.*

Defendant Whyte contends that Counts One and Two of the pending indictment should be severed from Count Three. As the basis for his motion, he alleges that "the only similarity between the two sets of Counts is the fact that Mr. Whyte is alleged to have participated in both conspiracies." This argument should be rejected.

First, contrary to the defendant's assertion, there is only *one* alleged drug conspiracy in this case: the conspiracy charged in Count One, which by its terms, spans the entire period from

on or about March 2, 2008 through on or about June 2, 2009. Each of the three counts of the indictment are accordingly part of a common scheme or plan.

"When offenses are joined under Rule 8 on the ground that they...constitut[e] parts of a common scheme or plan, it is manifest that evidence of one offense would ordinarily be admissible at a separate trial for the other." *United States v. Foutz*, 540 F.2d 733, 737 (4th Cir. 1976). That is precisely the case here: Indeed, there seems little doubt that even if Counts Two and Three (the two discrete counts of the indictment charging the defendant with attempted possession with intent to distribute five kilograms or more of a controlled dangerous substance) were severed, each attempted drug transaction would be admissible in the trial of the other under FED R. EVID. 404(b) as evidence of intent, knowledge, plan, identity, possession and absence of mistake. Specifically, in both transactions, the defendant:

- was the leader/organizer of the drug trafficking activity
- used an alias to mask his true identity from his associates;
- utilized a commercial interstate shipping carrier to have substantial amounts of cocaine sent from southern California to an address in Maryland;
- utilized a commercial interstate shipping carrier to send large sums of cash from Maryland to southern California;
- traveled to the scene of the expected narcotics delivery site in Maryland and "scouted" the surrounding environment to detect law enforcement surveillance prior to picking up he drugs; and
- paid low level individuals with no prior contact with the conspiracy, a/k/a "mules," to attempt to pick up the narcotics packages for delivery to him or his subordinates in order to insulate himself from the transaction.

In this regard, the offenses charged in Counts Two and Three have a "logical relationship" to one another, as well as to Count One of the indictment, which expressly links them together. Both offenses, moreover, share a substantial identity of facts and circumstances. Joinder is clearly permitted by the express terms of Rule 8(a), as the offenses charged are both

similar in character and "connected with or constitute parts of a common scheme..." *See* FED.R.CRIM.P. 8(a). Joinder of all three counts is entirely appropriate. *Cardwell*, 433 F.3d at 385.

### B.     Joinder of All of the Counts in the Indictment Will Not Prejudice the Defendant.

Rule 14 provides that notwithstanding the proper joinder of offenses, a defendant nevertheless may seek a severance where joinder prejudices the defendant. *See* FED.R.CRIM.P. 14. The Fourth Circuit has characterized as "rare" circumstances that require severance of offenses notwithstanding their proper joinder under Rule 8(a). *See Cardwell*, 433 F.3d at 387 ("This rule contemplates that joinder under Rule 8(a) can be proper and, at the same time, severance can be required. Such cases ... will be rare"). It is "not enough for the defendant to show that severance offers him a 'better chance of acquittal.'" *Caldwell*, 433 F.3d at 387 (quoting *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995)). Rather, the "defendant making a motion for severance pursuant to Rule 14 has the burden of demonstrating a strong showing of prejudice." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984). "A district court should grant a severance under Rule 14 *only* if there is a serious risk that a joint trial would...prevent the jury from making a reliable judgment about guilt or innocence." *Caldwell*, 433 F.3d at 387.

In that regard, the trial court "must balance any possible prejudice to the accused against the interests of the efficient administration of justice." *United States v. Cole*, 857 F.2d 971, 973 (4th Cir. 1988). "The striking of this balance is within the discretion of the trial court and the exercise of this discretion will be overturned only for clear abuse affecting substantial rights of the accused." *Id.* (citation omitted); *Hirschfeld*, 964 F.2d at 323 (denial of a motion to sever offenses is reviewed for an abuse of discretion); *United States v. Larouche*, 896 F.2d 815, 831 (4th Cir. 1990) (the court's decision in this regard "will not be disturbed unless the denial of a severance deprives the [defendant] of a fair trial and results in a miscarriage of justice").

Defendant Whyte argues that even if the joinder of the three counts in the indictment is appropriate, he would be prejudiced by their joinder. This claim, too, should be denied.

As all three counts in the indictment are properly joined, the defendant bears the burden of "demonstrating a strong showing of prejudice." *Goldman*, 750 F.2d at 1225. In his motion, the defendant makes no effort to demonstrate prejudice, let alone a strong showing of prejudice. Instead, he simply asserts "*potential* prejudice" (emphasis added); and he roots this meritless claim in the speculative notion that his "defense to Count One and Two [*sic*] are completely different and diametrically opposed to Count Three." The defendant declines to state what his defenses are, making an informed evaluation of his claim impossible. Even if he did announce his defenses, a mere showing of "potential" prejudice is plainly insufficient to merit severance. *Cf. United States v. Dirden*, 38 F.3d 1131, 1141 (10th Cir. 1994) ("We reiterate that the mere possibility of antagonistic defenses provides an inadequate basis for severing trials."). In any event, the alleged prejudice the defendant cites is illusory.

Indeed, the indictment presents no danger that the "jury may confuse and cumulate the evidence, and convict the defendant of one or both crimes when it would not convict him of either if it could keep the evidence properly segregated." *Foutz*, 540 F.2d at 736. As described above, the offenses charged in Counts Two and Three arise from a single conspiracy (as charged in Count One). Moreover, evidence relating to the offense charged in Count Two would be admissible in a trial of Count Three, and vice versa, under FED R. EVID. 404(b). The Fourth Circuit has recognized that severance after proper joinder is "rare," even when the offenses are merely and solely similar in character. Severing individual counts of attempted possession with intent to distribute a controlled dangerous substance based on the *same* scheme or conspiracy would be extraordinary – and is certainly not justified here, where the defendant has made no attempt at all to demonstrate any showing of prejudice. Even if there were irreconcilable defenses, moreover, potential prejudice could be alleviated by a limiting instruction. *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993).

10

Finally, there is no danger that the jury may conclude that the defendant is guilty of some counts and find him guilty of others based on his criminal disposition. *See Foutz*, 540 F.2d at 736. Once again, the indictment charges a *single conspiracy*. In addition, the jury will be instructed to "consider each count separately and return a separate verdict of guilty or not guilty for each" and that whether they "find the defendant guilty or not guilty as to one offense should not affect [their] verdict as to any other offense charged." *See* SAND, ET AL., MODERN FEDERAL JURY INSTRUCTIONS, 3-6; *cf. United States v. Cavale*, 688 F.2d 1098, 1108 (7th Cir. 1982) (upholding denial of severance considering, among other factors, court's instruction to jury to consider each defendant and count separately).

The defendant's motion seeking severance should be denied.

## II. MOTION TO SUPPRESS IDENTIFICATION EVIDENCE.

The defendant contends that law enforcement officers used identification procedures in this case "that were unnecessarily suggestive" and that, accordingly, "the resulting identification evidence is unreliable." Specifically, the defendant appears to be challenging the positive identification of the defendant by employees at two separate commercial interstate shipping carriers that the defendant used to mail large amounts of cash from Maryland to southern California, in connection with the drug trafficking activity charged in the indictment. He appears to seek to exclude the use of those pre-trial identifications at trial and to move to exclude any possible in-court identification of him by witnesses from the shipping carriers who identified him prior to trial. These contentions are without merit and should be rejected.

The defendant has been provided with discovery materials pertaining to the results of identification procedures conducted in relation to this case. Copies of the photo arrays, relevant reports, and the date and result of the arrays have also been provided. Specifically, photo arrays were presented to (1) Jigesh and Tara Patel, who worked at a commercial interstate shipping facility called "Goin Postal," from where the defendant shipped a package containing $78,000 in cash on March 17, 2008; and to (2) Tabatha Boughan, an employee of Coastal Air Inc., a commercial interstate shipping facility from where the defendant shipped a package containing

$299,570 on May 15, 2009.  The fairness of the arrays is apparent from the attached exhibits; each of the arrays consists of six photographs of the same type and size depicting similarly-appearing individuals.  Each array is discussed in further detail below.

### A. The Photo Array Identification By Goin' Postal Employees (March 2008 incident).

Task Force Officer Darin Cover, a Baltimore City police officer cross-designated to the federal task force investigating the drug trafficking activity that is the subject of the pending indictment, presented photo arrays to two individuals associated with Goin' Postal who may be called as government witnesses.  The arrays have been provided to the defendant.  Copies of the arrays and statements made in conjunction with the identifications are attached as follows:

> EXHIBIT 3 – Photo array shown to Tara Patel on February 20, 2009.

> EXHIBIT 4 – Photo array shown to Jigesh Patel on February 23, 2009.

As discussed, both Mr. Patel and Ms. Patel – who were interviewed individually on different dates – identified the defendant as the person who had deposited the package at Goin' Postal on March 17, 2008, which later was intercepted by law enforcement officers en route to California, opened pursuant to a search warrant and revealed to contain $78,000 in cash.

When a defendant objects to the use of pre-trial identifications as evidence at trial, or objects to testimony about a pre-trial identification, he first must show that the identification procedure was impermissibly suggestive. *Manson v. Braithwaite*, 432 U.S. 98 (1977).  The Supreme Court, in deciding whether a pre-trial identification was impermissibly suggestive, must look at the "totality of the circumstances." *Holdren v. Legursky*, 16 F.3d 57, 61-62 (4th Cir. 1994).  In this case, the pre-trial identification procedure used by law enforcement during the investigation was not impermissibly suggestive.

Specifically, the identification procedure used by investigative agents was as follows: The array was assembled with the intention of finding six similar appearing individuals, then the witness was simply asked to review the array and indicate any person who appeared to be familiar pursuant to the instructions printed on the array itself.  The government will call TFO

Darin Cover as a witness at the pre-trial motions hearing on August 27, 2010; he will thus be available at that time to address any questions the Court or the defendant may have about the identification procedure used with respect to the Goin' Postal employees.

If the Court finds the identification process impermissibly suggestive, the Court then must determine whether under the totality of the circumstances, "there is 'a very substantial likelihood of irreparable misidentification.'" *Manson*, 432 U.S. at 116 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). Thus, even where the defendant can prove that pre-trial identification procedures were impermissibly suggestive, the resulting pre-trial identification remains admissible if the Court finds, under the totality of the circumstances, that it is otherwise reliable. *See Manson*, 432 U.S. at 114-16; *see also United States v. Johnson*, 114 F.3d 435, 442 (4th Cir. 1997) (although pre-trial identification procedure was unduly suggestive, subsequent in-court identification was "sufficiently reliable" and therefore admissible). Indeed, if the Court finds that a pre-trial identification is reliable, "its alleged suggestiveness is of no import." *Legursky*, 16 F.3d at 61-62 (affirming admissibility of a pre-trial identification from an array containing five photographs). Accordingly, evidence that is not manifestly suspect should be submitted to the jury unless the pre-trial identification "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons*, 390 U.S. at 384. Because of the presumption that in-court identification testimony should be heard by the jury, it is not even necessary for a district court to hold an evidentiary hearing on this issue outside the presence of the jury, since cross-examination is a sufficient method by which the trustworthiness of any in-court identification can be tested. *See United States v. Muse*, 83 F.3d 672, 673 (4th Cir. 1996). Courts have, of course, held that an in-court identification is permissible only if it is not "tainted" by an improper pre-trial identification. *United States v. Crews*, 445 U.S. 463, 471-73 (1980). At the same time, courts have recognized that the exclusion of such in-court identification evidence from the jury is a "drastic sanction," and is therefore "limited to identification testimony which is manifestly suspect." *Harker v. Maryland*, 800 F.2d 437, 443 (4th Cir. 1986).

13

Whether in-court identifications should be permitted by a witness whose identification has been tainted by improper pre-trial identification procedures is governed by the "independent basis" test of *United States v. Wade*, 388 U.S. 218 (1967). *See, e.g., United States v. Burgos*, 55 F.3d 933, 941 (4th Cir. 1995) (citing *Wade* and permitting in-court identification following use of a suggestive photo spread in which the defendant was the only non-African-American, based on witness's "independent recollection" of defendant's appearance). Specifically, the Court must conduct a two-step inquiry in which it must: (1) examine whether the initial identification was impermissibly suggestive, and (2) decide whether, even if the pre-trial identification were suggestive, the in-court identification is nevertheless reliable. *Johnson*, 114 F.3d at 441. Among the factors used in determining the reliability of in-court identifications are: (1) the witness's opportunity to view the perpetrator; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the perpetrator; (4) the witness's level of certainty when identifying the defendant as the perpetrator at the time of the confrontation; and (5) the length of time between the crime and the confrontation. *Id.*

In this case, as noted above, there is absolutely no danger that the pre-trial identifications were unduly suggestive; accordingly, all in-court identifications of the defendant by Mr. Patel and Ms. Patel should be allowed. Indeed, as noted above, all pre-trial identifications of the defendant by these witnesses were done by a procedure in which the agent showed each witness photographs of various persons and asked him or her to identify anybody that the witness recognized.

Even if, for the sake of this discussion, any pre-trial procedures were suggestive, in-court identification testimony should nevertheless be allowed because the totality of the circumstances reveal the Patels' identification of the defendant to be reliable. As TFO Cover will testify, neither of the Patels evinced any hesitation in identifying the defendant as the person who dropped off the relevant package on March 17, 2008; each witness had viewed the defendant clearly and had given him his or her full attention at the time. And though several months passed between the time when the defendant dropped off the package at Goin' Postal and when the

witnesses were shown the photo arrays, that in itself does not suggest a "substantial" likelihood of misidentification. *Cf. Neil v. Biggers*, 409 U.S. 188, 201 (1972) (holding that, under totality of circumstances, seven month period between witness's encounter with defendant and identification of him in line-up did not implicate substantial likelihood of misidentification). Indeed, the defendant appears to have left a distinct impression on the Patels in March 2008: both witnesses clearly remembered the defendant because he acted in an obstreperous manner and insulted an elderly member of their family. Both witnesses plainly had independent bases upon which to identify the defendant, completely separate from the identification procedure used by the investigative agent. This case, accordingly, does not come close to being one in which in-court identifications should be suppressed. *See, e.g., Burgos*, 55 F.3d at 941 (permitting in-court identification following use of unduly suggestive pre-trial photo spread in which defendant was the only non-black individual); *Johnson*, 114 F.3d at 441-42 (permitting in-court identification after "unduly suggestive" single photo identification).

### B. The Photo Array Identification By a Coastal Air Employee (June 2009 incident).

TFO Cover was also the investigative agent who interviewed and presented a photo array to Tabatha Boughan, the Coastal Air employee who may be called at trial as a government witness. The array has been provided to the defendant. Copies of the arrays and statements made in conjunction with the identifications are attached as follows:

EXHIBIT 5 – Photo array shown to Tabatha Boughan on November 18, 2009.

As discussed, Ms. Boughan identified the defendant as the person who deposited the package at Coastal Air on May 15, 2009, which later was revealed to contain some $299,570 in cash. TFO Cover followed the same procedure with Ms. Boughan that he did with the Patels. This procedure was not impermissibly suggestive.

And even if, for the sake of argument, the identification procedure was impermissibly suggestive, the totality of the circumstances indicate that Ms. Boughan's identification of the defendant, as with the Patels, was reliable because of her independent recollection of the defendant and the circumstances of this shipment .

The defendant's motion seeking to suppress identification evidence should be denied.

### III. <u>MOTION TO SUPPRESS EVIDENCE</u>.

On April 27, 2010, the defendant was indicted by the a federal grand jury in Baltimore. A bench warrant for Whyte's arrest was issued at that time, and the indictment was sealed pending Whyte's arrest, which occurred on May 13, 2010.

The defendant contends that evidence lawfully seized following his arrest on May 13, 2010 from 211 Somerset Bay Drive and from a dark-colored Infinity vehicle bearing Maryland tags 89470CA (which the defendant had been operating just prior to his arrest), both of which were searched pursuant to a federal search and seizure warrant issued by a U.S. Magistrate Judge in Baltimore should be suppressed "on grounds that probable cause was lacking to believe that evidence of a crime would be found at [the] Somerset Bay [h]ome or in the Infinite [*sic*]." This contention is without merit and should be rejected.

#### A. <u>Whyte's Lack of Standing</u>.

The defendant's motion is silent as to any proffer that he has standing to move to suppres these searches or to challenge the underlying warrants. The government asserts the issue of lack of standing by the defendant to move to suppress either search and request that the court order that, prior to August 27, 2010, the defendant file an offer of proof as to his standing in both of the locations searched as a preliminary matter and that he produce evidence at the hearing to satisfy his burden.

The defendant's lack of standing in both Apartment #202 at 211 Somerset Bay Drive and the Infinity must be addressed first, since it largely negates the need for, and sharply delimits the scope of, any hearing that may be required. As discussed below, the government submits that the defendant has not met, not can he meet, his burden of showing that he had a legitimate expectation of privacy in either Apartment #202 or the Infinity. He, therefore, lacks standing to challenge the constitutionality of the seizure of any evidence recovered from either source.

A defendant's right to challenge a search depends on his showing that governmental officials violated some legitimate expectation of privacy he held in the premises searched, that is, that his individual Fourth Amendment rights were even implicated. *Rawlings v. Kentucky*, 439 U.S. 128 (1978); *United States v. Hawkins*, 788 F.2d 200, 203 (4th Cir. 1986) (defendant who did not reside in home had no expectation of privacy in residence or its contents). It is the defendant's burden to establish that he has standing. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *United States v. Horowitz*, 806 F.2d 1222, 1224 (4th Cir. 1986). The government submits that it should not be required to produce any evidence on the lawfulness of the search of either Apartment #202 or the Infinity until the defendant produces evidence to establish his standing to object to the searches.

Relevant factors used to determine the existence of a legitimate expectation of privacy include presence in the area searched, possession or ownership, prior use of the area searched or property seized, the ability to control or exclude others' use of the property, and a subjective expectation of privacy. *Rakas*, 439 U.S. at 143; *United States v. Lochan*, 674 F.2d 960, 965 (1st Cir. 1982). A subjective expectation of privacy is not determinative. The Fourth Circuit has noted, "[T]he thrust of the Fourth Amendment simply does not extend to locations lacking a foundation for reasonably expecting that the materials will be accorded privacy. Exploration by the government *although without a warrant* of non-private places does not compel the suppression of evidence so obtained." *United States v. Rampuran*, 632 F.2d 1149, 1153 (4th Cir. 1980) (emphasis added).[2] If the claimant cannot make a showing that he had a reasonable expectation of privacy, he cannot challenge the reasonableness of the search and seizure. *United States v. Rusher*, 966 F.2d 868, 873 (4th Cir. 1992). Moreover, the defendant's showing of standing may not be made by proffer – it requires *evidence* to support a finding that the movant

---

[2] As discussed herein, the government *did* secure a warrant to search both Apartment #202 and the Infinity. Thus, even if the defendant can establish standing – which he cannot, and which he has made no attempt to do in his motions before this Court – his attempt to suppress the seized evidence should be denied. *See infra* Part III.B; *cf. Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) ("[O]nce a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case.").

has a reasonable expectation of privacy in the place searched. *United States v. Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003). For the reasons described below, the defendant cannot demonstrate any reasonable expectation of privacy in either Apartment #202 or the Infinity.

         *1.  Defendant's Lack of Expectation of Privacy in Apartment #202.*

     The defendant had no legitimate expectation of privacy in Apartment #202 at 211 Somerset Bay Drive, nor has he submitted any evidence that he did. First, Apartment #202 was not owned or leased in the defendant's name. Second, he did not provide this address as a location that he considers home to the U.S. Probation Officer overseeing his supervised release – providing, instead, two *other* locations as places he is likely to spend the night. Third, apart from an energy bill that is in his name, the government is not aware off any other accounts associated with Apartment #202 that are linked to the defendant. Indeed, the defendant has not submitted any verifiable evidence indicating that he had a legitimate right to access the apartment or even to spend time there. Ultimately, the defendant has failed to put forth any evidence that would even begin to help him carry his burden of demonstrating a reasonable expectation of privacy in Apartment #202.

2. *Defendant's Lack of Expectation of Privacy In The Infinity.*

Similarly, the defendant cannot demonstrate a reasonable expectation of privacy in the Infinity, nor has he made any attempt to carry this burden. The vehicle was not registered in the defendant's name, nor has he put forth any other evidence or documentation suggesting that he was legally authorized even to occupy it, let alone drive it.

The defendant is likely to claim standing based on the fact that he was driving the Infinity in the days and weeks before being arrested on May 13, 2010. Simply driving a vehicle, however, does not create a reasonable expectation of privacy in that vehicle. *United States v. Martinez*, 983 F.2d 96 (10th Cir. 1992) (mere possession of vehicle and keys are not sufficient to confer standing to challenge search of vehicle); *United States v. Arango*, 912 F.2d 441 (10th Cir. 1990) (defendant's mere physical possession of a truck at time of search did not by itself give him standing to object to search; defendant had to introduce evidence that his possession of truck was lawful). In *United States v. Sanchez*, 943 F.2d 110 (1st Cir. 1991), the First Circuit held that the defendant had no standing to contest a search where he failed to establish that he had permission to use the car. The *Sanchez* Court ruled that the mere fact that the defendant was "driving [the car] when he was stopped" was insufficient to confer standing. *Sanchez*, 943 F.2d at 113. *See also United States v. Tobin*, 890 F.2d 319, 327 (11th Cir. 1989) (holding that having keys or driving the car is not sufficient to establish a possessory interest in the car). To the extent the defendant has put forth no evidence whatsoever establishing *any* relationship between him and the Infinity, let alone any credible evidence that the relationship was a lawful or legally recognized one, he has failed to demonstrate standing to challenge the search of that vehicle.

**B. The Search and Seizure Warrants Were Supported By Probable Cause.**

Investigative agents searched both Apartment #202 and the Infinity pursuant to search and seizure warrants that were authorized by United States Magistrate Judge Beth P. Gesner of this District on May 12, 2010 and executed later that day. Those warrants, the execution of which yielded evidence that is the subject of the defendant's motion to suppress, were supported

by a detailed affidavit authored and sworn to by Drug Enforcement Administration Special Agent
Alfred A. Cooke that clearly established probable cause. *See* **Exh. 6** (affidavit and search
warrants for Apartment #202 and the Infinity, respectively).

A district court's standard of review for a search warrant are well established. In
reviewing a determination of probable cause, the trial court must accord "great deference" to the
issuing judicial officer's finding of probable cause based on the facts submitted in the affidavit.
*United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990). The reviewing court must limit
its inquiry to asking "only whether the magistrate had a 'substantial basis...for concluding' that
probable cause existed." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). To find
probable cause, the magistrate must simply "make a practical common sense decision whether,
given all the circumstances in the affidavit before him,...there is a fair probability that contraband
or evidence of a crime will be found in a particular place." *Id.; Upton*, 466 U.S. at 733 (same);
*United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) (same). "Only the probability and not
a *prima facie* showing, of criminal activity, is the standard of probable cause." *Blackwood*, 913
F.2d at 142 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). The task of the
reviewing court is *not* to conduct a *de novo* determination of probable cause but instead only to
determine whether there is substantial evidence on the record to support the decision of the
issuing judge. *Upton,* 466 U.S. at 728. Under any standard of review, however, the search
warrants issued for the search of Apartment #202 and the Infinity, respectively, were valid.

Indeed, the affidavit in support of the search warrants laid out in considerable detail the
defendant's links to apparent drug trafficking activity, and the fact that he was driving the Infinity
(though that vehicle was not registered to him), often to or from Apartment #202 (though that
premises was not in his name), especially in the days and weeks leading to application of the
warrants. The affidavit detailed the fact that the defendant spent many nights and evenings
during the relevant time at Apartment #202, often after having spent time at a notorious open air
drug market in Baltimore City – actions that were consistent with those of one engaging in drug
distribution. The warrants plainly were issued with probable cause.

Finally, even if this Court were to conclude that the search warrants for Apartment #202 and the Infinity were issued without probable cause, absent a showing that the warrants were not valid on their face, or contained material information that the affiant knew was false, the good faith reliance of the police on the validity of the warrants issued by a neutral and detached magistrate was completely justified. *United States v. Leon*, 468 U.S. 897, 913 (1984). Pursuant to *Leon*, so long as the evidence was seized from the residence and from the vehicle during the execution of a properly-issued warrant, the fruits of the search should not be suppressed even if the affidavit is found to lack probable cause. *See United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993) (evidence is admissible under *Leon* good faith exception where warrant failed to establish a nexus to the residence searched). In the absence of an allegation that the magistrate abandoned her detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause. *United States v. Hyppolite*, 65 F.2d 1151, 1155 (4th Cir. 1995). No such showing has been made, nor has any such claim even been alleged, here. The defendant's motion to suppress evidence should be denied.

## CONCLUSION

For all these reasons, each of the defendant's pre-trial motions should be denied. Proposed Orders are attached.

Respectfully Submitted,

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

By:   _____ /s/_____
John F. Purcell
Sujit Raman
Assistant United States Attorneys

United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, Maryland  21202
(410) 209-4800

Dated: August ___, 2010

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 17th th day of August 2010, the foregoing was electronically filed using the District of Maryland CM/ECF system, and by that means was served upon:

> Marnitta L. King, Esq.
> 1401 Mercantile Lane
> Suite 381
> Largo, Maryland 20774
>
> *Counsel for Defendant Gregory A. Whyte*

                                   /s/
                                   Sujit Raman
                                   Assistant United States Attorney

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIM. NO. RDB-10-0212 |
| GREGORY ALFRED WHYTE | : | |
| a/k/a "Tony Smith," | | |
| a/k/a "Manny," | : | |
| Defendant. | : | |

...oOo...

**ORDER DENYING THE DEFENDANT'S MOTION**
**FOR SEVERANCE OF COUNTS PURSUANT TO FED. R. CRIM. P. 8**

Having considered the defendant's motion seeking to have certain counts of the indictment severed and tried separately (Paper #28), and the government's opposition thereto, it is this it is this ___ day of _____, 2010 hereby

**ORDERED** that the said motion be DENIED. The Court finds that joinder of all counts is appropriate under FED R. CRIM. P. 8. The Court further finds that the defendant has failed to demonstrate a strong showing of prejudice that would justify severing the properly joined counts under FED R. CRIM. P. 14.

_____
The Hon. Richard D. Bennett
U.S. District Court Judge

*Copies to:*

John F. Purcell
Sujit Raman
Assistant United States Attorneys
United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201

Marnitta L. King, Esq.
1401 Mercantile Lane
Suite 381
Largo, Maryland 20774

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | :     CRIM. NO. RDB-10-0212 |
| GREGORY ALFRED WHYTE | : |
|     a/k/a "Tony Smith," | |
|     a/k/a "Manny," | : |
|         Defendant. | : |

...oOo...

## ORDER DENYING THE DEFENDANT'S MOTION
## TO SUPPRESS IDENTIFICATION EVIDENCE

Having considered the defendant's motion seeking to suppress identification evidence (Paper #29), and the government's opposition thereto, it is this it is this ___ day of _____, 2010 hereby

**ORDERED** that the said motion be DENIED. The Court finds that the identification procedures used by the investigative agent were not impermissibly suggestive and that, in any event, each of the relevant witnesses had independent bases upon which to render a reliable identification of the defendant.

_____
The Hon. Richard D. Bennett
U.S. District Court Judge

*Copies to:*

John F. Purcell
Sujit Raman
Assistant United States Attorneys
United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201

Marnitta L. King, Esq.
1401 Mercantile Lane
Suite 381
Largo, Maryland 20774

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | :     CRIM. NO. RDB-10-0212 |
| GREGORY ALFRED WHYTE<br>    a/k/a "Tony Smith,"<br>    a/k/a "Manny," | :<br><br>: |
| Defendant. | : |

...oOo...

## ORDER DENYING THE DEFENDANT'S MOTION
## TO SUPPRESS EVIDENCE

Having considered the defendant's motion seeking to have certain counts of the indictment severed and tried separately (Paper #30), and the government's opposition thereto, it is this it is this ___ day of _____, 2010 hereby

**ORDERED** that the said motion be DENIED. The Court finds that the defendant has failed to demonstrate standing to challenge either of the searches whose fruits he wishes to suppress. Moreover, even if he had brought forth evidence supporting a finding of standing, the search and seizure warrants duly authorized by a magistrate judge of this District were properly supported by probable cause.

_____
The Hon. Richard D. Bennett
U.S. District Court Judge

*Copies to:*

John F. Purcell
Sujit Raman
Assistant United States Attorneys
United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, Maryland  21201

Marnitta L. King, Esq.
1401 Mercantile Lane
Suite 381
Largo, Maryland 20774